ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
APR 20 2007
CLERK, U.S. DISTRICT COURT
By ______ Deputy

ORIGINAL

| | | |
|---|---|---|
| RYDER INTEGRATED LOGISTICS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| JENNIFER WILCOX, | ) | Case No. 3-07CV0685-L |
| Defendant. | ) | |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff, Ryder Integrated Logistics, Inc. ("Ryder") respectfully submits this Complaint against Defendant Jennifer Wilcox ("Wilcox").

### I. NATURE OF ACTION AND RELIEF SOUGHT

1. This is an action against Wilcox for breach of fiduciary duty, misappropriation of trade secrets, theft of trade secrets, tortious interference with a contractual or business relationship, and violation of the Computer Fraud and Abuse Act ("CFAA"). Ryder seeks judgment against Wilcox for compensatory damages together with prejudgment interest, attorneys' fees and costs, injunctive relief, and such other and further relief, whether legal or equitable, as the Court deems just and proper.

2. Ryder seeks relief in the form of an injunction to stop Wilcox from, among other things, (1) continuing to provide Transportation Management services for or on behalf of third party LG Electronics U.S.A., Inc. or any of its related entities ("LG") or other Ryder customers or their respective vendors, suppliers, consultants or any third parties who provide goods or

services to LG or other Ryder customers, for a period of two (2) years; and (2) from disclosing Ryder's trade secrets and confidential and proprietary information to LG or other parties.

3. For purposes of this Complaint, "LG" means LG Electronics U.S.A., Inc. and its agents, employees, officers, directors, shareholders, representatives, affiliates, subsidiaries, predecessors, successors, parents, principals, heirs and assigns, vendors and/or their agents, representatives, predecessors, successors, heirs and assigns and vendors.

## II. THE PARTIES

4. Ryder is a Delaware corporation with its principal place of business in Miami, Florida. Ryder provides various warehousing, transportation and logistical services to customers located throughout the United States.

5. Upon information and belief, Wilcox is a citizen of Texas residing in the Northern District of Texas.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, because it is an action arising under the laws of the United States.

7. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Ryder seeks relief in the form of an injunction, as described above.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Wilcox resides in the Northern District of Texas, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in the Northern District of Texas.

## III. GENERAL ALLEGATIONS

### A. Ryder's Business Relationship With LG

9. On December 30, 2004, Ryder entered into a Master Logistics Agreement with LG pursuant to which Ryder agreed to provide certain logistics services to LG in exchange for a fee.

10. The Master Logistics Agreement contains a provision pursuant to which both parties agreed to refrain from soliciting the employees of the other:

> During the term of any Schedule and for a period of twelve (12) months after the expiration or termination of the applicable Schedule, neither Party to this Agreement (including, in the case of Client, Client's Affiliates and their successors and assigns; and in the case of RYDER, RYDER Affiliates and their successors and assigns) shall Actively Solicit the employment of any employee of the other Party, which employee was engaged in the performance of the Services. For purposes of this Agreement, "Actively Solicit" means to initially call or to initiate contact in any other manner with an employee of the other Party or its Affiliates for the purpose of inducing such employee to leave his or her present position. . . .

Master Logistics Agreement, ¶ 24.1.

11. Subsequently, the parties entered into various Distribution Management Schedules pursuant to which Ryder agreed to perform certain distribution management services in various locations for LG in exchange for a fee. The parties subsequently executed numerous amendments and attachments to the Distribution Management Schedules.

12. On June 8, 2005, the parties entered into a Transportation Management Schedule pursuant to which Ryder agreed to provide certain transportation management services to LG in exchange for a fee. That Schedule provided that Ryder would provide services to LG for a fee until July 10, 2008 and that the Schedule would continue in effect thereafter unless terminated.

13. LG has utilized Ryder's transportation, distribution, warehouse and logistical services for a number of years. During each year of its contracts with LG, Ryder earned millions of dollars in revenues as a result of its contracts with LG.

14. Ryder also has longstanding business relationships and contracts with various carriers. These carriers are third parties that Ryder contracts with to transport LG goods to and from warehouses and LG's customers.

15. Wilcox was employed by Ryder as Senior Logistics Manager on the LG account. In this position, she was responsible for Ryder's management of the day-to-day operations of the LG account. Wilcox participated in the selection and monitored the performance of the carriers used by Ryder to transport LG products from the port to the warehouses and from the warehouses to LG's customers. She was in daily contact with the sales people and the vendors involved on the account and communicated with LG daily. Wilcox also had the discretion to select carriers.

16. In this key position, Wilcox was placed in a position of trust and confidence, and had access to Ryder's confidential and proprietary information and trade secrets, including Ryder's: intellectual property; trade and business secrets; best practices; customer requirements; employee data; software code and modifications; customer, vendor and supplier lists; computer-generated reports; electronic information and software stored and used on computers; data used in the course of business; electronic mail; costs; profit and loss statements; financial data; plans for future development; corporate strategy; contracts with third parties; product lines and products; bids and quotes; cost and pricing information; and other business information not available to the public and which Ryder maintained as confidential.

17. Wilcox also had access to Ryder's financial information, including its Profit and Loss statements and the financial data for both the Transportation Management and Distribution Management services Ryder performed for LG.

18. Wilcox also acquired confidential and proprietary information and trade secrets regarding Ryder's "best practices," or its methods of servicing its transportation accounts. These "best practices" include the day-to-day methodology of how to operate an account, information about practices that have worked in the past, and customer and carrier preferences. Wilcox was trained in Ryder's best practices, and had access to the databases where these documented trade secret procedures are maintained. Ryder's "best practices" are confidential and proprietary trade secrets.

19. Wilcox also acquired confidential and proprietary information regarding the terms of Ryder's contractual relationship with LG. The confidential and proprietary information that Wilcox acquired included: Ryder's pricing and cost structure, the rates it charged LG for the lease and maintenance of equipment and facilities, LG's service needs and expectations, and customer preference issues that LG raised. Because of Wilcox's intimate knowledge of Ryder's confidential and proprietary information, Wilcox played a key role in servicing the LG contracts. All of the information, records and data that are confidential, proprietary and/or Ryder's trade secrets shall be referred to herein as "The Confidential Information."

**B. <u>Ryder's Interest and Actions to Protect Its Confidential Information</u>**

20. Ryder considers all of The Confidential Information to be its confidential and proprietary information and trade secrets. Accordingly, Ryder takes all reasonable and appropriate steps to ensure that that The Confidential Information is maintained on a confidential and need-to-know basis within the Company and that it is not disclosed to competitors.

21. Ryder distributes to all employees a booklet entitled "Principles of Business Conduct" which specifically states that:

> **CONFIDENTIAL/PROPRIETARY INFORMATION**
>
> All Ryder records and information relating to Ryder or its customers are confidential and you must treat them accordingly. Employees who knowingly or unknowingly reveal information of a confidential nature are subject to immediate and appropriate discipline, up to and including termination, and when appropriate, legal action.
>
> Confidential and proprietary information includes, but is not limited to Ryder's and its customers': intellectual property; trade and business secrets; best practices; customer requirements; copyrights; patents; logos; trademarks; employee data; software code and modifications; customer, vendor and supplier lists; computer-generated reports; electronic information and software stored and used on computers; data used in the course of business; electronic mail; costs; profit and loss statements and financial data; markets; plans for future development; corporate strategy; contracts with other parties; product lines and products; bids and quotes; pricing information, and other business information not available to the public.

A true and correct copy of the Principles of Business Conduct is attached as Exhibit 1. Similar language can be found in pages 21-22 of Ryder's Employee Handbook, which is distributed to Ryder's U.S. employees. A true and correct copy of relevant excerpts from the Ryder Employee Handbook is attached as Exhibit 2.

22. The Principles of Business Conduct further provides:

> **Removal from Premises**
>
> You may not remove any Ryder or Ryder-related information from Company premises (except in the ordinary course of performing duties on behalf of Ryder while employed by Ryder) without approval from an individual at director level or above. Such information includes, without limitation: documents, notes, files, records, price lists, manuals, employee data, computer files or similar materials as listed above.

*See* The Principles of Business Conduct. *See also* Ryder Employee Handbook p. 22.

23. The Principles of Business Conduct Agreement also prohibits the unauthorized disclosure of Ryder confidential and proprietary information:

> **Disclosure**
>
> When the Company entrusts you with its confidential and proprietary information, you must not use this information except in the performance of your duties as a Ryder employee. You may not disclose any confidential or proprietary information, purposefully or inadvertently (i.e. through casual conversation in an elevator or on an airplane) to any unauthorized person inside or outside of the Company.
>
> Both during and after your employment with the Company you may not disclose, copy, sell or distribute confidential and proprietary information to: any third party, or any other Ryder employee (unless it is on a "need to know" basis). You may not copy, replicate, or load any confidential and proprietary information onto any computer (including your home computer) other than a computer provided to you by Ryder without permission from your manager.

*See* The Principles of Business Conduct. *See also* Ryder Employee Handbook pp. 22-23.

24. The Principles of Business Conduct also address conflicts of interest:

> A conflict of interest may occur when an individuals' personal interests interfere or appear to interfere with Ryder's interests. Perceived conflicts of interest can be as damaging as actual conflicts. It is difficult to list every possible circumstance that could give rise to a possible conflict of interest. Ryder has, however, established specific guidance, in the following areas, where conflicts of interest most often arise:
>
> * * *
>
> 3. Providing Services to other Companies

*See* The Principles of Business Conduct. And, The Principles of Business Conduct requires Ryder employees to disclose possible conflicts of interest:

> Even if a situation is not covered by the guidelines above, it may result in a conflict of interest. If you find yourself in a situation that could cause a conflict of interest or the appearance of one, you are required to promptly inform your supervisor or any member of management so that the possible conflict and corrective action can be considered. If you do not wish to inform management, you may contact the Global Compliance Group directly.

*Id.*

25. The Ryder Employee Handbook also specifically defines the following as "Conflicting Activities:"

> In general, unless otherwise prohibited by law, outside work activities are not allowed when they:
>
> * * *
>
> - involve organizations that are doing or seek to do business with Ryder, including actual or potential vendors, suppliers, or customers, or
> - violate provisions of law or of the Company's policies or rules.

*See* Ryder Employee Handbook p. 24.

26. Under the title of "Work Product Ownership," the Ryder Employee Handbook further establishes that Ryder:

> [R]etains legal ownership of the work product of all full-time employees, part-time employees, temporary workers and independent contractors.

*See id.* at 26.

27. This section of the Ryder Employee Handbook continues in relevant part:

> <u>Components of Work Product</u>
>
> Work product includes:
>
> - written and electronic documents
> - audio and video recordings
> - system code; and
> - any concepts, ideas or other intellectual property developed for Ryder, regardless of whether the intellectual property is actually used by the Company.
>
> <u>Policy</u>
>
> No work product created while you are employed by Ryder can be claimed, construed or presented as your property, even after your employment with the Company is terminated or the relevant project completed.
>
> If appropriate, the Company:
>
> - may take civil and/or criminal action against anyone violating this policy, and

- will seek repayment of all legal fees and costs.

> Potential Conflicts of Interest
>
> Supplying other entities with certain work product or elements of work product may constitute a conflict of interest.

*See id.* at 27.

28. Ryder makes every effort to protect the proprietary and confidential nature of The Confidential Information. Employees who work for Ryder are granted different levels of security access on Ryder's computers and network system in order to ensure that they receive access to The Confidential Information on a need to know basis only. Ryder's confidentiality policy and its employees' obligations in this respect are spelled out in the Ryder Employee Handbook:

> Computer Security and Confidentiality
>
> All software and data resident on all Company computers (e.g., mainframe, AS400, workstation or portable computers), whether in production or being tested by the Company, are the sole and exclusive property of Ryder.
>
> Confidentiality
>
> As an employee of Ryder, you are responsible for taking all appropriate actions, whether by instruction, agreement or otherwise, to ensure the protection, confidentiality and security of confidential information.
>
> Written authorization from your senior field operations manager or director-level manager is required before you may acquire, use, access, copy, remove, modify, alter or disclose to any third parties, any confidential information for any purpose other than to perform duties required in fulfillment of your job responsibilities or in furtherance of expressly stated Company-sponsored activities.
>
> Identification and Password
>
> You are responsible for all activity performed with the use of your identification or password.
>
> Assigned Computers
>
> You are responsible for:

> - protecting any Company-owned or provided computer to ensure that its data, software and hardware are not misused, and
> - protecting and backing up your computer data.
>
> Reporting Breaches in Security
>
> If you become aware of any breach in security you should immediately report it to your supervisor.

*See id.* at 28.

29. Moreover, Ryder specifically includes violations of these policies under the heading "Embezzlement, Theft, Fraud and Non-Monetary Irregularities" and gives these relevant examples:

> - misuse of Company computer resources, including e-mail and voice mail
> - unauthorized or improper access, misuse, modification, destruction or disclosure of Company data/software or non-Company data/software for which the Company has been identified as accountable for the processing, accessing and/or storing.

*See id.* at 29.

30. On June 1, 2005, Wilcox signed a document acknowledging her receipt of the Principles of Business Conduct and her agreement to abide by its terms. A true and correct copy of the signed form is attached as Exhibit 3.

31. Also on June 1, 2005, Wilcox signed a document acknowledging her receipt of the Ryder Employee Handbook and her agreement to abide by its terms. A true and correct copy of the signed form is attached as Exhibit 4.

32. In a Ryder publication known as "Ryder People," Ryder also warned employees that information on Ryder computers are the property of Ryder and that Ryder reserved the right to review any such material:

> Generally, Ryder managers have the right to review anything on your computer or voicemail, without notice or consent from you.

> The Company also has the right to monitor your Internet access, including the sites you visit and the time spent if you use a Ryder computer, including a laptop… However, you must remember that Ryder's computers and telephone systems belong to the Company and are primarily for work-related purposes. . . .

Ryder People, Issue II 2006, a true and correct copy of which is attached as Exhibit 5.

### C. Wilcox's Wrongful Conduct

33. While still employed at Ryder, Wilcox began working with LG to displace Ryder as LG's logistics service provider and substitute herself (and others) in-house at LG. Wilcox took these actions while she was a Ryder employee using The Confidential Information. Wilcox knew that Ryder had a formal agreement with LG for a period of years, yet began working with LG clandestinely, to remove Ryder from the LG account. Wilcox took these actions with the plan and intention to become an LG employee where she would receive more remuneration, and would attempt to recreate Ryder's services in-house at LG and to personally benefit herself. Wilcox began using Ryder's confidential and proprietary information and trade secrets to assist LG in competing against Ryder, including assisting LG in creating a business model and transition plan. These actions enabled LG to terminate its contract with Ryder and itself perform the Transportation Management services that had been provided to LG by Ryder under the parties' contracts, with Wilcox's assistance.

34. Wilcox represented to Ryder that she was protecting Ryder as a loyal employee, and did not need to be closely supervised when in fact, she was plotting with LG to remove Ryder. One example is found in an e-mail exchange between Wilcox and her supervisor, Mike Borges ("Borges"), who was in charge of the entire LG-Ryder relationship. Borges asks why he was not copied on correspondence concerning important information on the LG account, and

why he only obtained the information after Larry Monaghan ("Monaghan"), an LG employee, forwarded it to him. This was Wilcox's response:

> You're joking right???
>
> I was simply telling the load planners to adhere to my point of contacts [sic] and not allow other people to take the business
>
> I did not think I need to copy you on EVERY little thing I send out.
>
> are you saying you now want that???
>
> Jennifer.

A true and correct copy of the January 8, 2007 e-mail string between Wilcox and Borges is attached as Exhibit 6. After Borges responded and reiterated that he wanted to be copied on all e-mails to Monaghan, Wilcox again resisted the request:

> Mike
>
> come on
>
> are you serious? I bust my butt and now I feel I am going to be micro managed by you???

*See id.*

35. Importantly, Borges responds by instructing Wilcox to copy him on everything that Wilcox sends to Monaghan of LG. *See id.* However, as demonstrated below, Wilcox does not follow these instructions, and instead sends The Confidential Information to Monaghan and others at LG without authorization from Ryder and in an attempt to assist LG in diverting Ryder's business away from Ryder.

36. Wilcox did not stop there. On that same day, she also forwarded the e-mail sent by Borges, her boss, to Monaghan of LG and chastised him for copying her boss on the prior e-mail:

> what is this?
>
> why did you copy him on an email meant for the centralized load planners?

> Is he now saying I have to copy him on every email I send out? if so, this will not work.
>
> Jennifer

A true and correct copy of the January 8, 2007 e-mail from Wilcox to Monaghan is attached as Exhibit 7.

37. Wilcox also shared The Confidential Information with LG.

38. While Wilcox was still employed by Ryder, she began assisting LG in transitioning its Transportation Management business from Ryder to its own in-house staff, which she intended to head as its Senior Transportation Manager. Wilcox began assisting LG and preparing for her new position well before she left Ryder. For example, as early as January 10, 2007, Monaghan of LG sent Wilcox an e-mail attaching an LG employee review. In the e-mail Monaghan explained to Wilcox that "I am showing you this as to how I address non performance issues and expectations. I wouldn't normally do this or share this. . . . It is the preparation for improvement or dehiring." A true and correct copy of the January 10, 2007 e-mail from Monaghan to Wilcox and its attachment is attached as Composite Exhibit 8. Obviously, Monaghan had already started training Wilcox to become an LG employee on January 10, 2007.

39. On that same day, Wilcox sent LG information regarding Ryder feedback relating to photographs taken to assist Ryder with its shipment and packing methods to Bruce Null of LG, despite knowing that her actions were wrong. In an e-mail string dated January 10, 2007, Wilcox was sent comments and photographs of shipments loaded on trailers at the Fontana warehouse by Joe Christopher, a Corporate Account Executive for Ryder. Wilcox forwarded the pictures to Tom Matte, a Group Logistics Manager at Ryder. Matte responded by indicating that he shared Christopher's concerns with the way the trailers were being loaded, but added that

"this is how Bruce Null has told us to ship them." Wilcox then forwarded the e-mail to Bruce Null of LG with the following comment: "Please do not let him know I sent this to you but here is the feedback I got from them on the photos [sic]." A true and correct copy of the January 10, 2007 e-mail from Wilcox to Bruce Null of LG is attached as Exhibit 9.

40. In an e-mail dated February 15, 2007, Monaghan of LG sent Borges of Ryder, an e-mail essentially indicating that Wilcox has Ryder's back, and scolding Ryder for failing to appreciate her value to the company: "You know Mike [sic] Jennifer is [sic] worth to Ryder is much greater than she is given credit for and worth so much more than some Ryder associates who constantly don't have your back and leave you on the road by yourself [sic] as they can't be counted on." A true and correct copy of the February 15, 2007 e-mail is attached as Exhibit 10. Of course, Wilcox did not "have Ryder's back" at all; she was secretly working to assist LG in taking Ryder's business.

41. Indeed, in a January 3, 2007 e-mail string amongst a carrier, Monaghan of LG and Wilcox, Monaghan says of Wilcox: "She is my allay [sic] and ***ace in the hole.***" (emphasis added). A true and correct copy of the January 3, 2007 e-mail is attached as Exhibit 11. As this e-mail exchange shows, Wilcox was Monaghan's and LG's secret asset at Ryder.

42. Then on March 16, 2007, while still employed by Ryder, Wilcox continued planning the transition of the LG business from Ryder to LG. On that day, Wilcox sent an e-mail from her Ryder e-mail address to James Mason at LG, enclosing a "Transition Gantt Chart"[1] and

---

[1] A Gantt chart is a project plan chart that graphically depicts the duration of tasks against the progression of time.

a document titled "Logistics Weekly Meeting TPLAN3 16-07.ppt." A true and correct copy of the March 16, 2007 e-mail as well as the attachments are attached as composite Exhibit 12.

43. Several charts were sent to LG as attachments to the March 16, 2007 e-mail. Each chart shows that Wilcox, while still an employee of Ryder and using Ryder computers and her Ryder e-mail address, created, or assisted LG in creating, a Transition Plan -- a plan to transition the Transportation Management services from Ryder to LG. *See id.* The various charts show Wilcox's plan to take over the Ryder business. For example, in a chart titled "Project Management," as tasks, she lists the following: "Determine Project Team" and "Determine Office Space Needs." She also lists as a task: "Draft Announcement Letters," and under this heading, lists the following as sub-tasks: draft "Transportation Schedule" and draft "Distribution Schedules." Additionally, she lists as a task "Internal Announcements," and the following as sub-tasks under this heading: "Draft LG Internal Announcement; Send email to HQ and Executives;" "Send email to Directors & Above;" "Send email to all employees;" and "Send New Contract List to All."

44. Significantly, the chart shows that a number of the tasks listed on the table were "done" as early as January of 2007, while others were completed in February and March, all while Wilcox was employed by and owed a fiduciary duty to Ryder. All tasks were to be completed by March 30, 2007. Wilcox's loyalties obviously were with LG when she drafted, modified and/or added to this document, despite the fact that she still was employed by Ryder, still was on Ryder's payroll, and still owed Ryder a fiduciary duty.

45. The other charts, which are titled "Transportation," "Distribution," "Finance" and "Systems" similarly make it clear that Wilcox was assisting LG in transitioning its

Transportation Management services business from Ryder to LG, despite the fact that she was still an employee of Ryder.

46. Wilcox used The Confidential Information, including "best practices," she obtained and could have only obtained by working for Ryder to prepare transition plans and assist LG in taking away LG's Transportation Management services business from Ryder and preparing to perform the work in-house at LG with Wilcox at the helm.

47. Wilcox used her extensive knowledge of Ryder's "best practices" and of The Confidential Information to assist LG in creating a business model that would allow LG to terminate its contracts with Ryder and perform the Transportation Management services itself or "in house."

48. Ryder Freight Brokerage Process in Support of Reverse Logistics Program. LG used a reverse logistics program to transport return loads of its products. The reverse logistics program was supported by the Ryder Freight Brokerage Group (RFB). RFB supported the day-to-day operations of the reverse logistics program. When implementing the reverse logistics program, Wilcox and RFB created a pricing template that would be used as "benchmark" pricing for each lane. RFB would submit to Wilcox a proposed rate that it would charge LG for the services of each transaction. At that time, Wilcox -- using the benchmark pricing template -- was expected to either approve or reject the rate presented by RFB.

49. Carrier Selection Process/Back-Solicitation. In support of the reverse logistics program, one of RFB's roles was to develop a carrier base. In the development of a carrier base, Ryder would negotiate rates with the carrier to transport loads in each lane. As a fee for its brokerage services, Ryder was entitled to the difference between the rates charged by the carriers and the rates it charged its customers, such as LG.

50. In or about January, 2007 (when, as discussed above, Wilcox had already begun helping LG transition its Transportation Management business away from Ryder), Wilcox began demanding more information than she previously had needed or received to approve the backhaul rates, including: the name of the carrier and/or the carrier code, the rate, the mileage, the lane, and the weight of the load. Prior to that time, Wilcox was given the rate charged to LG and nothing else. Wilcox then provided this information to LG.

51. Wilcox and LG used this information to reduce substantially and/or eliminate any margin or profit earned by Ryder for providing LG with brokerage services for obtaining carriers to support the reverse logistics program.

52. Additionally, using this information, LG was able to create a carrier database that it could use to displace Ryder and operate its own reverse logistics program, with Wilcox's assistance.

53. Through Wilcox's disclosure of The Confidential Information, LG obtained an unfair competitive advantage at Ryder's expense.

54. Wilcox was aware of and participated in LG's plan to terminate its contracts with Ryder. For example, on March 16, 2007, Gary Osborne of USA Truck (a carrier used by Ryder to transport LG goods) and his associate Jake Assaway met with Wilcox and Monaghan of LG at a facility in the Northern District of Texas. Wilcox attended the meeting purportedly as an employee and representative for Ryder, since she was still employed by Ryder. The meeting was purportedly called by Wilcox on behalf of Ryder to discuss logistics relating to USA Truck's recently successful bid to provide "core carrier" services for Ryder's LG business. During the meeting, however, Wilcox advised Osborne that the LG-Ryder contract was expiring on July 19, 2007 and "they were not sure whether it would be renewed." Wilcox advised Osborne that they

expected USA Truck to be the carrier regardless of whether the contract was terminated -- it was just a matter of whether USA Truck would serve Ryder or LG. At the time Wilcox made these statements to Osborne, neither Wilcox nor LG had given Ryder any indication that the LG-Ryder contract would be terminated.

55. Likewise, Jim Barrett of Innovative (another carrier used by Ryder to transport LG goods), attended a meeting in the Northern District of Texas in March, 2007. Barrett attended the meeting at the request of Wilcox. In addition to Wilcox, Monaghan of LG, was present at the meeting. Monaghan advised that there was a possibility LG's contract with Ryder would not be renewed. Monaghan further advised Barrett that, if the contract was not renewed, Wilcox would join LG to manage distribution management as she had done with Ryder. At the time of the meeting, Wilcox was still employed by Ryder.

56. Upon information and belief, Wilcox had similar meetings with other Ryder carriers and advised all of the carriers that Ryder's contract could be terminated by LG. Wilcox did not inform anyone at Ryder of LG's plan and intention to terminate the Transportation Schedule with Ryder. Wilcox never informed anyone at Ryder that she was meeting with Ryder's carriers and setting the stage to transition them to LG, once Ryder was terminated.

57. Wilcox also was conspiring with Reynolds of LG to take the LG account away from Ryder. In approximately mid-March, 2007, Wilcox and Reynolds discussed their intention to "screw Ryder." They discussed the fact that as soon as LG and Reynolds took over the Transportation Management business, Wilcox would quit Ryder and work for LG directly. They also stated that they would let Ryder pay to train all the temps, and then make them LG employees. In fact, Wilcox and Reynolds told temps hired by and paid for by Ryder that they were "technically" working for Ryder, but "actually" working for LG.

58. Wilcox and Reynolds also made it clear during discussions that LG was planning to or intended to "go live" with its Transportation Management business on March 31, 2007. In other words, it planned to transition the Transportation Management business from Ryder to LG by this date.

59. Moreover, in an e-mail string between Wilcox (using her Ryder e-mail address) and various LG employees, including Monaghan and James Mason, Wilcox admits her deception of Ryder. The e-mail string begins with a series of e-mails between LG and Ryder employees titled "Loads that did ship by 5:00 pm - Fontana month close update." On April 2, 2007, Monaghan writes to thank her for her efforts. Significantly, Monaghan copies a multitude of LG and Ryder employees on this e-mail, including Borges, Wilcox's supervisor at Ryder, and James Mason of LG. A true and correct copy of the April 2, 2007 e-mail is attached as Exhibit 13.

60. Wilcox responds on that same day, and copies various LG and Ryder employees, including her supervisor Borges, and James Mason of LG:

> Thanks Larry but I love my job and this was just a part of it. Makes life exciting and fun [sic]
>
> I am VERY happy to help LG make goals and achieve the sales needed [sic]

*See id.*

61. Then, in an e-mail also dated April 2, 2007, James Mason of LG responds solely to Wilcox, and not to any of the other Ryder employees that were copied on the e-mail string, to say: "I forget to say 'welcome aboard.'" Wilcox's response, solely to Mason, also on April 2, 2007, shows her complicity with LG:

> I am SO excited!!!
>
> I can't wait for Wednesday [sic]

*See id.*

62. Not coincidentally, Wednesday, April 4, 2007, was both the day that LG terminated the Transportation Management Schedule and relationship between Ryder and LG and, as set forth below, the day that Wilcox submitted her resignation to Ryder. Despite knowing this information, Wilcox did not inform anyone at Ryder of LG's plan and intention to terminate the Transportation Schedule with Ryder.

### D. Wilcox's Resignation

63. On April 4, 2007, Wilcox e-mailed Borges her letter of resignation, notifying him that April 18, 2007 would be her last working day at Ryder. A true and correct copy of the April 4, 2007 e-mail and attached letter of resignation are attached as composite Exhibit 14. In that letter, she indicated that she "applied to the open Senior Manager position with LG and it was accepted **this evening.**" (emphasis added). Obviously, Wilcox had been working with LG long before this resignation.

64. Wilcox also sent Ryder's compliance department a different letter of resignation, also dated April 4, 2007. In this letter, she merely advises Borges that April 18, 2007 will be her last working day at Ryder. This letter did not mention that she had applied for a position with LG or when she had accepted the position. A true and correct copy of the second letter of resignation dated April 4, 2007 is attached as Exhibit 15.

65. When asked for another copy of the letter by Ryder's compliance department, Ryder received yet another version of Wilcox's resignation letter. This third version of the letter, a true and correct copy of which is attached as Exhibit 16, was faxed by Wilcox to Marcia at Ryder, (305) 500-3198. This letter also advises that April 18, 2007 will be her last working day, and indicates that she is appreciative of the opportunities and the growth that she experienced while employed at Ryder. Again, in this version Wilcox did not mention that she had applied for

a position at LG, the position that she would be assuming for LG or when she had accepted it. She obviously thought better about including her initial statement that she "applied to the open Senior Manager position with LG and it was accepted **this evening**" in the second and third versions of her resignation as she was clearly working to assist LG way before that time.

66. On the same day that Wilcox resigned, April 4, 2007, as Wilcox had planned during the time she was a Ryder employee, LG sent Ryder a 90-day notice of termination of the Transportation Management Schedules.

67. On Friday, April 6, 2007, Ryder employees Borges and Cindy Stene met with Wilcox at Ryder's offices for her exit interview. Because Ryder had a multitude of evidence showing that Wilcox already had begun assisting LG and working against Ryder, Ryder terminated Wilcox effective April 6, 2007.

68. Wilcox began "officially" working for LG almost immediately, but no later than Wednesday, April 11, 2007, when Wilcox sent an e-mail to the carriers used by Ryder to service the transportation needs of LG for the LG account. A true and correct copy of the April 11, 2007 e-mail is attached as Exhibit 17. In the e-mail, Wilcox attaches a proposed draft LG Carrier Contract and sets forth a proposed schedule that she plans to follow in order to get all of the Ryder carriers to execute the contract. She further advises:

> My role with LG as the Senior Transportation Manger will be to manage carrier contracting/pricing, billing, carrier ranking, lane assigments [sic], load planning, reverse logistics transporation [sic], tracking/tracing, daily operational issues, carrier manangement [sic], and the transportation cost saving initiatives for LG.

*See* Exhibit 17. These are the exact same responsibilities that Wilcox performed for Ryder as its transportation manager.

69. Similarly, on April 12, 2007, Wilcox began sending Ryder e-mails on behalf of LG. On that date, Monaghan of LG confirmed in an April 12, 2007 e-mail to Borges, Director of Customer Logistics for Ryder and Wilcox's former supervisor, that because Ryder had released Wilcox early, "we brought her on." A true and correct copy of the April 12, 2007 e-mail is attached as Exhibit 18.

## E. Irreparable Harm

70. Wilcox's unlawful activities are eroding and threaten to continue to erode the value of Ryder's business goodwill. If Wilcox is not enjoined from breaching the fiduciary duty she owes to Ryder, and if she is not enjoined from continuing to divulge or use The Confidential Information, and from otherwise misappropriating or stealing Ryder's trade secrets, and otherwise interfering with Ryder's business relations, Ryder will continue to suffer the loss of protection of its trade secrets, confidential and proprietary information, its customers' business and attendant goodwill, resulting in damages which cannot be determined.

## COUNT I

## Breach of Fiduciary Duty

71. Plaintiff repeats and realleges paragraphs 1 through 70 and incorporates them by reference.

72. As an employee of Ryder and the Senior Logistics Manager in charge of LG's account, Ryder reposed trust and confidence in Wilcox, and Wilcox accepted that trust and confidence. Wilcox also acquired significant influence in running the day-to-day operations of the Transportation Management services on the account. As the Senior Logistics Manager, Wilcox owed Ryder a fiduciary duty of the utmost good faith and loyalty, including a duty of candor and a duty not to engage in conflicts of interest, and not to exploit, in competition with

Ryder, her position of trust and confidence with Ryder. This common law fiduciary duty survives termination of employment and is an adequate basis for injunction.

73. Wilcox breached her fiduciary duty of good faith and loyalty to Ryder by working with and for LG to displace Ryder from LG's transportation management services, for Wilcox's personal gain. Wilcox had personal interests that she pursued at the expense of her employer. Wilcox also had an improper relationship with LG, and worked for the benefit of LG and adverse to Ryder to displace Ryder as LG's logistics' service provider and substitute herself and others in-house at LG.

74. Wilcox also breached her fiduciary duty of good faith and loyalty to Ryder by interfering with Ryder's contractual relationships with its carriers for the benefit of LG.

75. Through her wrongdoing as described above, Wilcox has breached her fiduciary duty to Ryder.

76. As a result of Wilcox's ongoing wrongdoing, Ryder has suffered and continues to suffer substantial and irreparable injury due to Wilcox's disloyalty and the loss of the business and goodwill of its customers and the loss of its work force, for which there is no adequate remedy at law to compensate Ryder.

77. Pursuant to TEX. CIV. PRAC. & REM. CODE § 65.011, and common law, Ryder has a clear legal right to the injunctive relief requested.

78. The entry of the requested injunction would not be contrary to the interests of the general public.

**COUNT II**

**Misappropriation of Trade Secrets (Under Common Law) and/or Theft of Trade Secrets**

79. Plaintiff repeats and realleges paragraphs 1 through 78 and incorporates them by reference.

80. By virtue of her employment as a key employee with a fiduciary duty at Ryder and by virtue of her performance of responsibilities for Ryder with respect to the customer account for LG, Wilcox acquired access to and knowledge of The Confidential Information, including information regarding Ryder and its products, its costs and pricing strategies, its market strategies, its "best practices" as well as a host of other confidential and proprietary information as reflected above. In essence, Wilcox acquired The Confidential Information from Ryder that would permit LG and herself to displace Ryder at LG and substitute an in-house service run by herself, at substantial personal gain and at Ryder's expense.

81. Ryder used all reasonable means to prevent the disclosure of The Confidential Information, and Wilcox agreed to maintain its secrecy as well.

82. Wilcox has misappropriated, exploited, disclosed, stolen and used The Confidential Information for her own self-interest and to compete unfairly against Ryder in breach of her fiduciary duty owed to Ryder.

83. Wilcox communicated The Confidential Information to LG without Ryder's consent or authorization. This disclosure and use of The Confidential Information is to Ryder's competitive disadvantage, including LG's termination of its contract with Ryder.

84. As a result of Wilcox's wrongdoing, Ryder has suffered and continues to suffer substantial and irreparable injury due to the loss of The Confidential Information and the wrongful exploitation of that information by Wilcox in direct competition with Ryder, as well as

the loss of the business and goodwill of its customers, for which there is no adequate remedy at law to compensate Ryder. Such irreparable injuries will continue unless Wilcox's conduct is enjoined.

85. Ryder never has consented, expressly or impliedly, to the disclosure or use by Wilcox of The Confidential Information. Disclosure and/or use of The Confidential Information by Wilcox has and will continue to constitute a misappropriation within the meaning of TEX. CIV. PRAC. & REM. CODE § 134.002 and TEX. PENAL CODE § 31.05(b).

86. Pursuant to TEX. CIV. PRAC. & REM. CODE § 65.011, and common law, Ryder has a clear legal right to the injunctive relief requested.

87. The entry of an injunction will not be contrary to the interests of the general public.

88. Ryder is entitled to recover its attorneys' fees, costs and all damages allowed by TEX. CIV. PRAC. & REM. CODE § 134.005.

## COUNT III

### Tortious Interference With a Contractual or Business Relationship

89. Plaintiff repeats and realleges the allegations of paragraphs 1 through 88 and incorporates them by reference.

90. Ryder has entered into valid business and contractual relationships with each of its customers, including LG.

91. Ryder also has entered into valid business and contractual relationships with its carriers.

92. At all times relevant to this litigation, Wilcox has been aware and had actual knowledge of the existence of Ryder's relationship and agreements with LG and its carriers.

93. Wilcox assisted LG in acts that were adverse to Ryder while she was a Ryder employee and assisted LG in displacing her employer, Ryder. She also has interfered with Ryder's contractual and business relationships with its carriers.

94. As a result, Wilcox wrongfully has interfered with Ryder's relationship and agreements with LG and its carriers.

95. By assisting LG in displacing Ryder while she was a Ryder employee, Wilcox has wrongfully and intentionally interfered with Ryder's contractual and business relationship with LG and its carriers. She also has assisted LG in terminating its relationship with Ryder and/or breaching its contract with Ryder, and has encouraged Ryder's carriers to enter into relationships with LG instead of Ryder.

96. As a result of Wilcox's ongoing wrongdoing, Ryder has suffered and continues to suffer substantial and irreparable injury due to Wilcox's interference with Ryder's relationships with LG and its carriers.

## COUNT IV

## Computer Fraud and Abuse Act ("CFAA")

97. Plaintiff repeats and realleges the allegations of paragraphs 1 through 96 and incorporates them by reference.

98. At all times material to this Complaint, Wilcox had access to a computer provided by Ryder for use in conducting Ryder business. Ryder's business policies, which Wilcox was well aware of, state that the computers Wilcox used as well as the work product and data of such computers was the property of Ryder.

99. The Ryder computer that Wilcox used, and the Ryder computers that Wilcox had access to during her employment at Ryder, were "protected computers" as defined in

18 U.S.C. § 1030(e)(2), because the computers were used in and to conduct interstate commerce and communication.

100. Wilcox, knowingly and with intent to defraud Ryder, committed the following acts:

101. Wilcox exceeded her authorized access to the protected computers when she obtained The Confidential Information and transmitted it to LG without Ryder's authorization or consent.

102. Moreover, Wilcox was acting as LG's agent when she acquired and transmitted things of value exceeding $5,000, including but not limited to, The Confidential Information, to LG. Therefore, Wilcox also aided and abetted LG in accessing a protected computer without authorization.

103. Wilcox intentionally accessed the protected computers and exceeded her authorization.

104. Wilcox defrauded Ryder by making representations that she was loyally serving Ryder while maintaining the LG account, when in fact she was plotting with LG to remove Ryder and to secure her new position at LG, all at Ryder's expense. This duplicity is shown in the email exchange between Wilcox and her supervisor, and Wilcox and Monaghan of LG, on January 8, 2007, described above in paragraphs 34-36.

105. Wilcox disclosed The Confidential Information to LG in furtherance of Wilcox's and LG's fraud against Ryder.

106. Wilcox's actions caused loss to Ryder in excess of $5,000.

107. Wilcox also destroyed files and data on Ryder's computers. In destroying these records, Wilcox altered information on Ryder's computers that she was not authorized to alter, thereby causing damage to Ryder.

108. Pursuant to 18 U.S.C. § 1030(g), Ryder is entitled to compensatory damages and injunctive relief as a result of Wilcox's violation of the CFAA.

WHEREFORE, Ryder prays for the following relief:

1. a preliminary injunction prohibiting Wilcox from, directly or indirectly, conducting or continuing to provide Transportation Management or other services for or on behalf of LG (or any other Ryder customers) or their respective vendors, suppliers, consultants, or any third parties providing products or services to LG or any other Ryder customers, for a period of two (2) years;

2. a preliminary injunction directing Wilcox to return to Ryder The Confidential Information in her possession, custody or control;

3. a preliminary injunction directing Wilcox to cease disclosing and/or using, directly or indirectly, The Confidential Information in her possession custody or control for her own benefit or the benefit of anyone other than Ryder, including an injunction prohibiting her from talking to or consulting with LG;

4. a permanent injunction rendering permanent the relief described in the preliminary injunctions requested above;

5. an award to Ryder of economic and compensatory damages against Wilcox in an amount to be determined at trial as a result of Wilcox's wrongful conduct;

6. an award to Ryder of punitive damages according to proof at trial;

7. an award to Ryder of its attorneys' fees, costs and expenses of this action, as well as all damages and other relief provided for by applicable law; and

8. an award to Ryder of such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By: ______________________________

Charles A. Gall
Texas Bar No. 07281500
Cgall@hunton.com
James W. Bowen
Texas Bar No. 02723305
Jbowen@hunton.com
Eric Hail
Texas Bar No. 24047579
Ehail@hunton.com

HUNTON & WILLIAMS LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
(214) 468-3300
(214) 468-3599 (fax)

-and-

Marty Steinberg
Florida Bar No. 187293
Msteinberg@hunton.com
Application for admission *pro hac vice* to be submitted
Laurie Uustal Mathews
Florida Bar No. 120618
Lmathews@hunton.com
Application for admission *pro hac vice* to be submitted
HUNTON & WILLIAMS LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
(305) 810-2500
(305) 810-2460 (fax)

ATTORNEYS FOR PLAINTIFF

## PRINCIPLES OF BUSINESS CONDUCT

Ryder expects its employees to conduct business according to the highest ethical standards of conduct whether or not such action is required by the law.

### Shared Accountability for Compliance with the Law and Ethical Standards of Business Conduct

The Principles of Business Conduct ("Principles") is a guide to the Company's compliance structure, applicable laws, and key policies and procedures that govern doing business in a legal and ethical manner. These Principles do not cover every situation that you are likely to encounter, but they do address those that are most important to the Company, as well as new regulations and policies that have been added since the last distribution of the Principles. To help you determine whether you are or are not taking the proper course of action, we have included some of the most frequently asked questions and answers after each Principle. If you need additional guidance, we will tell you whom to contact. If you have doubts about your course of conduct, ask yourself the following questions:

Could your actions harm Ryder's reputation?

Is it ethical and legal?

What would your family and friends say?

How would it look in the newspaper?

Would you bet your job on it?

Should you check with someone else?

How would your actions appear to others?

The Principles of Business Conduct apply in all countries where we conduct business. All employees are subject to the laws and regulations of the locations where they work, but because Ryder is a global company, other laws may apply as well. In some instances, U.S. law might apply to conduct that occurs outside the country for example, in the case of anticorruption and bribery and insider trading laws. If you are unclear about which policies and regulations apply to your activities, be sure to consult with your manager; your human resources representative; the Global Compliance Group at 1-800-62-RYDER or ethics@ryder.com, or the Internal Audit Services Department. Contact information is available at your location, on ryder.com and on Ryder's intranet, FAME.

Although the Company has established formal mechanisms to ensure that we comply with regulations and policies, Ryder views all employees as critical to maintaining an effective compliance system. In addition to your personal responsibilities for following the standards described in these policies, you are responsible for raising concerns about risks to the Company before these risks become actual problems.

All Ryder employees are required to report suspected or known violations of policy or the law. If you become aware of any suspected or known wrongdoing, you must abide by the following procedure:

**EXHIBIT 1**

File a report on any issue other than Safety, Security, Theft or Workplace Violence by contacting the Hotline at 800-815-2830 in the U.S. and Canada or through an ATT operator from international locations. A HOTLINE representative will answer your call and listen to your concern. You may be asked follow-up questions to gather additional information in support of your report. At the end of your call, you will be given a callback date and code number to reference your call. Following your call, a written report is prepared based on the information you provided. This report is then forwarded confidentially to Ryder for review, investigation and response, as appropriate.

These calls are anonymous and confidential. You may also contact one of the following departments instead:

| Issue | Notification Requirement |
|---|---|
| **Safety, Security, Theft, Violence** | **Lotus Notes Security Incident Database** |
| **Workplace Conduct, Discrimination, Harassment, Employee Relations Issues** | **Contact Human Resources** |
| **"Kickbacks," Financial/Accounting Improprieties, Fraud, Time card abuse** | **Call the Internal Audit Services Department (305-500-4255) Global Compliance at 800-62-RYDER or** ethics@ryder.com |
| **Legal Violations (i.e. antitrust; insider trading; bribery/corruption; breach of confidentiality; trade secret theft; privacy)** | **Call Global Compliance at 800-62-RYDER or email ethics@ryder.com** |
| **Conflicts of Interest (i.e. improper gifts and loans; investment in or providing services to other companies; nepotism)** | **Call Global Compliance at 800-62-RYDER or email ethics@ryder.com** |

Individuals may also confidentially and anonymously report suspected violations regarding any policy or ask questions via email to the Company's corporate compliance website, ethics@ryder.com.

Strict procedures are in place to protect your identity, if you desire such protection. You may make anonymous reports, however, it may not be possible to fully investigate your concerns without some identifying details about your allegations, even if you do not disclose your name. All reasonable attempts will be made to investigate every claim as thoroughly as possible.

**RYDER FORBIDS RETALIATION AGAINST ANY EMPLOYEE WHO FILES A REPORT BASED ON HIS OR HER REASONABLE BELIEF THAT A VIOLATION OR SUSPECTED VIOLATION OF THESE PRINCIPLES HAS OCCURRED OR IS ABOUT TO OCCUR. IF YOU BELIEVE THAT YOU HAVE EXPERIENCED RETALIATION BECAUSE YOU HAVE FILED A REPORT, IMMEDIATELY CONTACT ANY MANAGER, HUMAN RESOURCES OR THE GLOBAL COMPLIANCE GROUP AT 1-800-62-RYDER.**

Employees who file malicious or intentionally false reports of a violation of these Principles and employees who have knowledge of, but fail to report a violation will be subject to disciplinary action, up through and including termination.

Ryder will investigate any suspected violation of these Principles, including the failure to report a violation. If appropriate, law enforcement authorities will be notified. The Company supports criminal prosecution of those involved in any violation of these Principles that constitutes criminal conduct, regardless of restitution. This support will specifically include, but not be limited to, complete cooperation with respect to the availability of witnesses, documents and any necessary financial expenditures. In addition, when appropriate, the Company will institute civil and/or criminal proceedings against violators of these Principles.

**Procedures for Waivers of these Principles**

These Principles of Business Conduct apply to all Ryder officers, employees and members of the Board of Directors. There shall be no waiver of any part of these Principles for members of the Board of Directors or senior officers, except by a majority vote of Ryder's Board of Directors or its Governance Committee, which will ascertain whether the waiver is appropriate and will ensure that the waiver is accompanied by appropriate controls designated to protect Ryder. Although the Board cannot conceive of any circumstance under which a waiver would be granted, in the extraordinary event that a waiver is granted, the waiver will be posted on Ryder's website and shall be disclosed in a public filing made with the Securities and Exchange Commission.

**All employees and members of the Board of Directors must comply with these Principles. In addition to these Principles, the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and senior financial management must comply with an additional code of ethics outlined below.**

## CODE OF ETHICS FOR CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER, AND SENIOR FINANCIAL MANAGEMENT

The CEO, the CFO, and all senior financial management are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the Securities and Exchange Commission (the "SEC"). Accordingly, it is the responsibility of the CEO and each senior financial manager to promptly to bring to the attention of the CEO and/or the CFO, as appropriate, any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings. In addition, the CEO, the CFO, and each senior financial manager will assist the Company's Disclosure Committee in fulfilling its responsibilities to assure the accuracy and completeness of the Company's periodic reports.

The CEO, the CFO, and each senior financial manager shall promptly bring to the attention of the Disclosure Committee and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO, the CFO and each senior financial manager shall promptly bring to the attention of the General Counsel or the CEO and to the Audit Committee any information he or she may have concerning any violation of the Company's Principles of Business Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO, the CFO, and each senior financial manager shall promptly bring to the attention of the General Counsel or the CEO and to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

## CONSEQUENCES OF VIOLATING THESE PRINCIPLES

The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Principles of Business Conduct or of this supplemental Code of Ethics by the CEO, the CFO, and the Company's senior financial managers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Principles of Business Conduct and to this supplemental Code of Ethics, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension, or when appropriate, termination of the individual's employment. In determining what action is appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

## EXAMPLES OF VIOLATIONS OF PRINCIPLES OF BUSINESS CONDUCT

As an employee, you are expected to know the legal, policy, and financial controls that apply to your job. You are responsible for keeping accurate financial records for all of your transactions and business assessments, understanding the financial records and processes associated with your job, and protecting the Company assets and information that are entrusted to you. You are forbidden to use, authorize or condone the use of "off book" bookkeeping, unauthorized accounts, unrecorded bank accounts, "slush funds," falsified books or any other device which could distort records or reports of the Company's true operating results and financial condition. You must alert your manager, human resources, the Global Compliance Group at 1-800-62-RYDER, ethics@ryder.com, the Internal Audit Services Department, or the Ryder HOTLINE at (800) 815-2830 or if you become aware of any:

actions that could harm Ryder's reputation as an ethical company

financial records that don't accurately reflect the nature of the transaction

pressure for certain accounting results

efforts to avoid standard review and control processes

lack of periodic reviews of financial practices, records and results

poor record retention practices

failure to appropriately carry out duties regarding custody for recording and approving transactions affecting the Company's assets

financial results that do not match underlying performance

funds that have not been reported or assets that have not been recorded

transactions that lack the proper supporting documentation

lack of controls to protect physical assets from loss or impairment

estimates that are not supported by facts or appropriate documents

falsification of any reports

conversion to cash of checks made payable to the Company

misstatement of travel or expense reports or processing of non-business items for expense report reimbursement

engaging in any unethical act to entice a customer or potential customer to do business with the Company or another company

failure to report accurately the proceeds from the disposal of assets

acceptance of kickbacks

authorization for payment of goods and services not received, or over-payment for goods actually received or valid services performed

misuse of Company computer resources, including e-mail and voice mail

unauthorized or improper access, misuse, modification, destruction or disclosure of Company data/software or non-Company data/software for which the Company has been identified as accountable for the processing, accessing and/or storing

delay in reporting expenses or revenues

failure to follow policies relating to capital expenditures

theft of Company equipment

using "workarounds" or schemes to avoid complying with domestic and/or international laws or policies

unauthorized use or disclosure of any confidential information or work product

inappropriate relationships among employees or between employees and vendors or customers that could pose a conflict of interests

***Frequently Asked Questions:***

Q: I believe that my manager is stealing money from the Company. If I report this, how do I know that my contacts with the HOTLINE or ethics@ryder.com will really be kept confidential? How can the Company guarantee that I won't face retaliation for making a report?

A. You may provide your name to a Ryder HOTLINE specialist, but if you choose not to do so, you will receive a control number so that you may call back for a follow-up report regarding the resolution of your report. The calls are not recorded and there are no tracing mechanisms. If you have a concern that you want to report anonymously online, ryder.com will direct you to a screen that contains a form that you will complete online. That form will not list your email address and you do not need to identify yourself unless you choose to do so. Anonymous reports will be given the same priority as all other complaints. The Company will take action against anyone who retaliates against an employee who expresses a concern in good faith.

Q: Are the reporting mechanisms only for Ryder employees? Do the Principles apply to people who work on Ryder's behalf?

A. These Principles are posted on ryder.com, and vendors, customers, former employees and members of the general public are able to report their concerns through the Hotline, ethics@ryder.com, or by contacting the Global Compliance Group at 1-800-62-RYDER. Our Principles apply to consultants, agents and representatives of Ryder .

Q. I know that one of my co-workers is falsifying her time sheets. I am not a manager and I don't want to get involved. Do I have to do anything?

A. All employees are obligated to report wrongdoing. Falsification of time sheets is considered theft from the Company and may violate the law. You should definitely report your concerns.

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

Ryder is committed to Equal Employment Opportunity (EEO) throughout the workplace. Employment, recruitment, hiring and placement, compensation, benefits, promotion, training and termination at Ryder are based upon personal capabilities and qualifications regardless of: age, race, color, national origin, gender, sexual orientation, religion, disability status, veteran status, and any other status protected by law.

If you have a question or concern regarding EEO, contact any Human Resources manager, or the Global Compliance Group at 1-800-62-RYDER. Any employee willfully violating this policy may be subject to appropriate disciplinary action, up to and including termination.

## AFFIRMATIVE ACTION

As a federal government sub-contractor, Ryder is required to have Affirmative Action plans. These plans demonstrate the Company's commitment to hiring and promoting qualified minorities, females, covered veterans, individuals with disabilities and any other category as required by law.

### Policy Against Harassment, Discrimination and Retaliation

Ryder does not condone or tolerate unlawful harassment, discriminatory behavior or retaliation against individuals who report such behavior in good faith. Ryder's Policy Against Harassment, Discrimination and Retaliation (HDR Policy) applies to harassment, discrimination or retaliation that occurs on Ryder premises or in some other location where Company activities occur, including Company parties, informal lunches or gatherings and vendor or customer sites.

Ryder will also ensure that people employed by its vendors, suppliers, customers and contractors adhere to the Policy, and appropriate action is taken against those who harass, discriminate or retaliate against its employees.

## BEHAVIOR VIOLATING POLICY

Ryder strictly adheres to all federal, state and local laws governing harassment, discrimination and retaliation. However, there is a wide range of what could be considered inappropriate behavior under Ryder's HDR Policy even though such behavior may not be considered illegal.

The following examples are not intended to serve as a guide to what could legally be considered harassment, discrimination or retaliation, nor is this list intended to be all-inclusive. A violation of Ryder's Policy may lead to disciplinary action whether or not it violates the law.

## EXAMPLES OF BEHAVIOR VIOLATING RYDER'S POLICY:

negatively affecting someone's employment because of a refusal to submit to sexual demands

negatively affecting someone's employment on the basis of that person's age, race, color, national origin, gender, sexual orientation, marital status, religion, disability status, veteran status or any other class protected by law

engaging in the threat of or actual retaliation against any person who, in good faith, reports or files a claim of harassment or discrimination, or participates in internal investigations

using degrading or stereotypical words or actions in jokes, cartoons, insults, tricks, pranks or horseplay related to sex, race, national origin, age, marital status, sexual orientation, religion, disability, veteran status or any other class protected by law

circulating offensive or inappropriate e-mails, letters, etc.

using sexually suggestive or mocking comments which describe an individual's body or attire

engaging in unwelcome sexual flirtation

whistling or "cat calls"

making graphic or verbal commentary about an individual's body, sexual prowess or sexual deficiencies

mocking, ridiculing or mimicking another's culture, accent, appearance or customs

engaging in unwanted touching, grabbing, holding, kissing or hugging

engaging in repeated "accidental" contact or other unwanted physical contact

displaying sexually suggestive or provocative pictures or objects

displaying an individual's actual physical body or parts of the body in a graphic manner

staring or leering at a person's body

**Relationships**

At times, consensual romantic and/or sexual relationships or platonic living relationships between co-workers may occur. Such relationships between a supervisor and an employee in which the employee has the ability to impact the progress or assignments of another employee are strictly prohibited, even when there is no direct reporting responsibility. Similarly, the Company prohibits relationships between employees who are not in a subordinate relationship but who are in a position of support or trust.

Therefore, if such relationships arise between the supervisor or person involved is required to disclose the relationship to the Human Resources Department so that a change in the responsibilities of the individuals involved or transfer of location within Ryder can occur.

The Human Resources Department will work with the supervisor's and employee's management to determine the appropriate action. At a minimum, the supervisor must withdraw from participation in activities or decisions that may reward or disadvantage the employee, including decisions related to hiring, performance appraisals, promotions, compensation, work assignments and discipline.

Such employees are not permitted to be in working relationships that could create situations that, in the Company's sole discretion, unduly influence their job performance or the performance of others. If no transfer or change is possible, one employee will be required to voluntarily terminate employment with the Company.

Whether or not the relationship has been disclosed, if you believe that you were penalized in terms of employment because of such a relationship, you should contact your Human Resources manager immediately.

## IF A POLICY VIOLATION OCCURS

When you believe that a violation of the Company's policy against harassment, discrimination or retaliation has occurred, you may, but are not required to, respond to the person causing the problem. Sometimes telling that person clearly and directly how you experience the behavior, asking the person to stop, and letting the person know the consequences of continuing such behavior. can rectify the situation.

You are nonetheless required to report offensive conduct so that the Company can take the necessary steps to rectify the situation if the offensive conduct continues or you believe that the conduct is so severe or widespread that action must be taken.

Report the conduct by contacting any Human Resources manager or the Global Compliance Group at 1-800-62-RYDER or through ethics@ryder.com

Some disclosure of your allegations may be necessary to the person under investigation, witnesses or other key individuals. All efforts will be made to keep as much information confidential as possible.

**Supervisors or managers who witness a possible violation of the Company's policy against Harassment, Discrimination or Retaliation are required to intervene and report the incident, whether or not the individuals are in their chain of command. Failure to do so will result in disciplinary action, up to and including termination.**

## DISCIPLINARY PROCEDURES

If an investigation reveals that the alleged policy violation did occur, the offender will be subject to appropriate disciplinary action, up to and including termination.

### False Reports

Any employee who knowingly makes a false report against another employee is subject to disciplinary action, up to and including termination.

Any employee who in good faith reports what appears to be a violation of our policy against harassment, discrimination or retaliation—even if the reported incident is determined not to be a policy violation—will not be subject to disciplinary action for making the complaint.

## AVOIDING INAPPROPRIATE BEHAVIOR OR CONDUCT

In order to ensure that all Ryder locations are free from inappropriate behavior or conduct every employee and manager must fulfill the following requirements:

Set an example by your own behavior and consistently treat others with respect and dignity.

Do not use inappropriate language.

Refrain from joking or bantering that might make others uncomfortable, even if it appears consensual.

Remove any inappropriate, sexually suggestive or offensive pictures, calendars, screensavers or objects from your work place.

Report inappropriate graffiti.

Do not make sexually suggestive comments.

Intervene when others tell inappropriate jokes or tease someone in your work environment. Report the incident if necessary.

Do not forward offensive or inappropriate e-mails to others, and inform senders not to send such e-mails to you at your workplace.

## AMERICANS WITH DISABILITIES ACT POLICY

Ryder is committed to complying with all applicable provisions of the Americans With Disabilities Act (ADA) as well as state law versions of the ADA.

## REASONABLE ACCOMMODATIONS

If you believe you have an ADA-defined disability and need reasonable accommodations to perform the essential functions of your job, contact your immediate supervisor.

Unless otherwise prohibited by law, Ryder will provide reasonable accommodations as long as:

the accommodations do not constitute an undue hardship on the Company

you are able to perform the essential functions of your job with or without accommodations, and

your working does not pose a direct threat to yourself or others.

**Note:** The ADA does not require Ryder to make the best possible accommodation, to reallocate essential job functions or to provide personal use items (e.g., eyeglasses, hearing aids, wheelchairs).

When appropriate, Ryder will work with you (and your healthcare provider, if necessary) on an interactive basis to develop an appropriate accommodation.

## QUESTIONS, INQUIRIES OR COMPLAINTS

If you have any questions regarding the implementation of the ADA or believe that you were discriminated, harassed or retaliated against, based on a disability, notify your Human Resources manager or the Global Compliance Group at 1-800-62-RYDER.

Your inquiry or complaint will be treated as confidential to the extent permissible by law.

## OPEN DOOR PROCESS

As a Ryder employee, you may participate in the Company's Open Door Process. Through the Open Door Process you are guaranteed the right to talk about any work-related concerns with any member of management without fear of retaliation.

**Important:** This process does not apply if you are subject to a collective bargaining agreement. If you are covered by a collective bargaining agreement, follow the grievance process outlined in that agreement.

## COMPANY POLICY ON RETALIATION

Company policy strictly prohibits retaliation against any employee who in good faith exercises legally protected rights or who utilizes the Open Door Process.

If at any time during or following the Open Door Process you believe you are being subjected to retaliation, report it to human resources. Upon completion of an investigation, anyone found to be responsible for retaliatory behavior is subject to disciplinary action, up to and including termination.

## CHAIN OF COMMAND

To best address your work-related issue, it is important that all appropriate levels of management have an opportunity to review your question, suggestion or complaint. The use of the chain of command ensures that the proper decision-makers are involved in the resolution decision. You should first address your issue with your immediate supervisor or your Human Resources representative. However, if you do not feel comfortable speaking with your supervisor, you may skip that person and go directly to the next level.

Regardless of where you begin the process, Ryder's Human Resources Department is responsible for ensuring that your issue is resolved in a timely manner with the correct levels of management involvement.

**In situations involving a violation of ethics, Principles of Business Conduct, the law or the Company's Policy Against Harassment, Discrimination and Retaliation, you may directly contact any Human Resources manager, or the Global Compliance Group at 1-800-62-RYDER. In these situations, the Company does not require that you follow the chain of command.**

## THE PROCESS

The process of resolving your issue should take place one stage at a time. If, at the conclusion of any phase, you are not satisfied, proceed to the next stage.

You have the right to appeal a decision at any stage in the process. However, your appeal must be made within 10 business days of the date the decision was communicated. The appeal must be on the appropriate resolution process document (see forms 3-42, Request for Open Door Review; 3-43, Open Door Appeals Request; and 3-44, Open door Review – CEO) to which all previous documentation is attached.

### Stage One

During stage one, orally discuss your issue with your immediate supervisor, your supervisor's supervisor or your Human Resources manager. This person is responsible for investigating the facts and will normally provide you with a response within 10 days (excluding Saturday, Sunday and holidays). If you are dissatisfied with the stage one response, you may proceed to stage two.

**Note:** You are <u>not</u> required to notify your supervisor that you are proceeding to the next stage.

### Stage Two

During stage two you should put your issue in writing using the appropriate resolution process document, and take your issue to the next supervisory level.

To hasten the investigation, submit your issue within 60 days (unless there are unusual circumstances). To ensure that your issue is resolved in a timely manner, the Company strongly recommends that you submit your issue as promptly as possible.

The second-level supervisor is responsible for investigating the facts and will normally provide you with a response within 10 days (excluding Saturday, Sunday and holidays).

The second-level supervisor is also required to send copies of your written issue to your immediate supervisor and your Human Resources manager.

**Note:** If the second-level supervisor's office is geographically separated from your location, a conference call may be arranged.

If you are dissatisfied with the stage two response, you may proceed to stage three.

**Stage Three**

During stage three you should put your issue in writing using the appropriate resolution process document, and take your issue to the next supervisory level, which, depending on your department is your General Manager (GM), Director of Customer Logistics (DCL) or next appropriate level of management.

The GM, DCL or next appropriate level of management is responsible for investigating the facts and normally will provide you with a response within 10 business days (excluding Saturday, Sunday and holidays). This person is also required to provide your Human Resources manager with a copy of that response.

If you are dissatisfied with the stage three response, you may proceed to stage four.

**Stage Four**

During stage four you should put your issue in writing using the appropriate resolution process document, and take your issue to the next supervisory level, which is your area vice president. (Headquarters or Shared Services Center employees should discuss their issues with the next appropriate level of management.)

The area vice president or next appropriate level of management is responsible for investigating the facts and will normally provide you with a response within 10 business days (excluding Saturday, Sunday and holidays). This person is also required to provide your Human Resources manager with a copy of that response.

If you are dissatisfied with the stage four response, you may proceed to stage five.

**Stage Five**

During this final stage, you may escalate your issue to the Chief Executive Officer (CEO) or the CEO's designate (executive vice president level or above) by putting your issue in writing using the appropriate resolution process document.

**REVIEWER'S RESPONSIBILITIES**

Upon receipt of your issue, the reviewer should carefully examine all documentation produced by any previous manager/reviewer and follow up when appropriate; respond to you in writing within 10 business days of your request for review, unless circumstances warrant a longer response time; provide you with written documentation describing your issue as it relates to Company policy or practice; and copy your Human Resources manager on all related correspondence.

If a resolution warrants a longer response time period, the reviewer must inform you in writing, within the defined time. This communication must include the reason for the delay, and estimated response date.

## CONFLICTS OF INTEREST

A conflict of interest may occur when an individual's personal interests interfere or appear to interfere with Ryder's interests. Perceived conflicts of interest can be as damaging as actual conflicts. It is difficult to list every possible circumstance that could give rise to a possible conflict of interest. Ryder has, however, established specific guidance in the following areas, where conflicts of interest most often arise.

1. Gifts, Personal Loans and offers to perform Personal Services
2. Investments in other Companies
3. Providing Services to other Companies
4. Working with Family Members and Others With Whom You Have a Close Personal Relationship/Nepotism
5. Inside Information and Securities Trading
6. Doing business with the Government
7. Disclosure of Possible Conflicts of Interest

**Note:** These standards apply to you and to your immediate family, which is defined as one of the following: spouse, domestic partner, child, parent (including in-laws), sibling, grandparent, grandchild, roommate, relative residing at your home, anyone serving in the place of one of the previously mentioned family members, and in some circumstances, close personal friends.

### 1. GIFTS, PERSONAL LOANS, AND OFFERS TO PERFORM PERSONAL SERVICES

It is never appropriate to ask for gifts, which can take the form of goods or services. From time to time, you may give or receive gifts that are meant to show friendship, appreciation or thanks from or to people who do business with Ryder.

You may also receive offers to provide services to you personally from vendors, employees, customers or others who want to do business with Ryder. These offers of personal service to you or your family members should be refused and you should never ask others to perform these services for your personal gain.

Generally speaking, accepting or giving gifts such as t-shirts, flowers, candy, logoed items, or other nominal items is acceptable, provided you do not ask for the gift and as long as it does not influence, or have the appearance of influencing objective decision-making. It is generally inappropriate to give or accept: more than $100.00 worth of gifts to or from a single source in any twelve-month period; lavish entertainment; invitations to leisure trips that require overnight travel; or other benefits resulting in personal gain (e.g. preferential access to IPOs). Cash gifts are never appropriate.

The Company will consider many factors to determine the appropriateness of any gift over the $100.00 amount including, but not limited to: whether the gift is customary or industry appropriate and openly given without any expectation or realization of special advantage, or whether the gift is clearly advertising or promotional material marked with the company or brand names. You may accept or provide entertainment if it occurs infrequently; arises out of the ordinary course of business; involves reasonable, not lavish, expenditures; does not violate the other party's company's policies; and takes place in settings that are reasonably appropriate and fitting to you, your hosts or guests, and the business at hand.

Personal loans to officers and members of Ryder's Board of Directors, or guarantees of such obligations, are prohibited.

If you have questions about this policy, you should seek guidance from your human resources representative, an officer in your organization, or the Global Compliance Group at 1-800-62-RYDER.

*Frequently asked questions:*

Q: Can I give one of my customers tickets to a sporting event?

A. Giving tickets is acceptable if it's part of relationship management, it does not violate the customer's own policies, and if your manager provides approval in advance. If the customer is an official, employee or agent of a governmental official, contact the Global Compliance Group at 1-800-62-RYDER for guidance.

Q : Can I accept a business meal from a customer or supplier? What about tickets to the Super Bowl or another high profile event?

A. You may let a customer or supplier pay for a meal arranged for the purpose of discussing business. However, it is inappropriate to let customers or suppliers repeatedly pay for your meals. You should exercise extra caution if you are in the middle of negotiating a contract with a supplier, and that supplier offers to provide expensive tickets or other lavish entertainment. When in doubt, contact your manager or the Global Compliance Group.

Q: One of our customers sent me an expensive gift basket for the holidays. Am I allowed to keep it?

A. You may accept the gift if it is unsolicited, not lavish, and would not cloud or be perceived as clouding your business judgment. It may be wise to share the gift with members of your department, others within the Company, or donate it to a charity. If you have questions, consult with your manager or the Global Corporate Compliance Group.

Q: One of our vendors offered me the use of his vacation home for a week. It costs him nothing, and Ryder had a long-term relationship with this vendor even before I started working for the Company. I am not personally involved in negotiating the contracts, and the vendor has not asked for any special treatment. May I accept this offer?

A. Although the vendor has not asked for a favor in return, there could be an appearance of impropriety to the employees, the customer and/or other vendors. There may come a time when you have more influence or involvement in the award of contracts to this and other vendors, and therefore you must avoid any actions that could lead others to believe that you would not be impartial.

**2. INVESTMENTS IN OTHER COMPANIES/PROVIDING SERVICES TO RYDER AS A VENDOR**

Employees may generally buy stock or hold investments in other companies, including companies that compete, do business, or are negotiating to do business with Ryder. If an employee, however, holds a substantial interest in a customer, supplier, partner, vendor, or competitor ("Partner/Competitor") there may be a conflict between the Company's interests and the employee's financial interest. As a general guide (but not limit), "substantial interest" is an ownership interest greater than 5% of the total net worth of the employee and immediate family members, or greater than 1% of the outstanding equity securities for investments in a public company. This policy does not apply to mutual funds or managed accounts in which the employee exercises no discretion as to the choice of investment.

Employees and those defined as "family" in this Conflicts of Interest policy are prohibited from providing services to Ryder as a vendor. Employees who currently serve as vendors or who have family vendors who serve as vendors must notify the appropriate Human Resources Manager and the Vice President of Global Compliance at 800-62 RYDER or ethics@ryder.com immediately. Failure to do so will lead to termination of employment.

Ryder also prohibits employees from investing in a Partner/Competitor of Ryder's if, by virtue of your position with Ryder, you have access to material, nonpublic information about the Partner/Competitor or may be able to influence Ryder's decision to do business with them.

If you are unsure about whether a situation could result in a conflict of interest, ask for guidance from the Global Compliance Group at 1-800-62-RYDER.

*Frequently Asked Questions*

Q: My wife inherited an amount of our competitor's stock that would be considered "substantial" under the guidelines listed above. I have just become aware of the Company's policy. Does she have to sell it?

A. The answer will depend on your position within the Company, among other factors. Although you do not own the stock yourself, your wife's financial interest could have the potential to influence your decisionmaking in a manner that is directly or indirectly adverse to Ryder's interests. Even if you have no such intent, the appearance of impropriety could harm the Company. You should contact the Global Compliance Group for guidance. Failure to do so could be a violation of the Principles of Business Conduct.

## 3. PROVIDING SERVICES TO OTHER COMPANIES/BOARD POSITIONS

There are serious responsibilities and obligations associated with becoming a member of any company's board of directors. These could include potential financial liability, time and travel commitments, public relations issues, and potential expectations of helping to make contacts within Ryder. Therefore, you should not accept an invitation to become a board member of any for-profit company unless if necessary you have received written approval from your supervisor, and human resources, and your supervisor, if necessary has obtained guidance from the Global Compliance Group. If you already are serving as a board member of another company, you should promptly seek written approval from your supervisor and human resources, and your supervisor should obtain guidance from the Global Compliance Group to continue in your board position.

**Other Services to Partner/Competitor Companies**: Given the potential for a conflict of interest, you should not serve as an advisor, consultant or employee of a Partner/Competitor of the Company (unless the Company is being paid for these services), without written approval from your supervisor, human resources, and an officer in your organization.

**Other Services to Other Companies**: If there is no actual or apparent conflict of interest or a violation of the Company's confidentiality policies, and you continue to meet the performance standards of your job, you may provide services in any capacity not covered above such as a not-for profit organization, without pre-approval. All employees will be judged by the same performance standard and will be subject to the Company's scheduling needs, regardless of any existing outside work requirements. If your outside work interferes with your performance or ability to meet the current requirements of your job, you may be asked to terminate the outside employment or involvement.

***Frequently Asked Questions:***

Q: I own my own catering business and want to provide services to Ryder employees as well as the general public. I would not be competing with any of Ryder's business interests. Am I permitted to do this?

A: If you do not use Company resources or time to solicit business from, your participation in the business is accomplished outside of your normal work hours, and it does not adversely impact Ryder or your ability to do your job, this would not be a conflict of interest. However, generally, you may not provide services to Ryder as a vendor.

## 4. WORKING WITH FAMILY MEMBERS AND OTHERS WITH WHOM YOU HAVE A CLOSE PERSONAL RELATIONSHIP/NEPOTISM

It is not unusual in companies the size of Ryder to have relatives working for the same company, and members of an employee's immediate family will be considered for employment on the basis of their qualifications. Generally, this does not result in conflict. But sometimes situations in this area can be troublesome. For example, it would be an inappropriate conflict for you to hire or seek to inappropriately influence another employee to hire a relative or member of your household. Similarly, it could be a conflict if you have a reporting or business relationship with employees who also work in the same area as a relative or member of your household.

Therefore, an immediate family member, roommate, close personal friend (in certain circumstances), or an individual who is currently involved in a non-platonic relationship with a Ryder employee may not be hired in or support the same department or work group or continue to work in or support that group it would create a supervisor/subordinate relationship with any individual described above, have the potential for creating an adverse impact on work performance of the employee or others, or reasonably create an actual conflict of interest, the appearance of a conflict of interest, or the perception of unfairness to other employees.

Depending on the circumstances, employees who become family members (through marriage, domestic partnerships or otherwise) may be prohibited from continuing in working relationships that would create one of the above conditions. This policy must be considered when assigning, transferring or promoting an employee. Any such situation should be reported to your Human Resources representative so that proper procedures can be followed.

It also could be a conflict if you, on behalf of Ryder, do business with another company in which you or a family member has a personal or financial interest. Any such situation should be reported to your supervisor and the Global Compliance Group at 1-800-62-RYDER for guidance and approval.

***Frequently Asked Questions:***

Q: Am I allowed to date a woman/man who is not in my direct chain of command but who is in my department at a lower level or who provides support to my group?

A. If you have the ability or potential to have an impact on his/her performance appraisals, promotional opportunities, salary adjustments, or continued employment, even in an informal or "off the record" capacity, you should not date the employee. Dating the employee could be a policy violation and could cause others to believe that s/he could receive preferential treatment from the Company. Such perceptions often lead to disruption in the workforce, poor morale, and reduced productivity.

Q: I am in charge of hiring one of the vendors at our facility. My sister-in-law owns a business that provides a service that Ryder needs. We put the contract out for bid. She is competitively priced and has an excellent reputation in our city. Can I hire her firm?

A. Although it appears as though you took steps to avoid a conflict of interests, unfortunately, there could still be the perception of favoritism. Generally, in this situation, the company would not hire her firm.

**5. INSIDE INFORMATION AND SECURITIES TRADING**

The Company's Board of Directors has adopted an Insider Trading Policy(the "Policy") both to prevent insider trading and to help employees avoid the severe consequences associated with violations of the insider trading laws. The insider trading laws prevent the purchase or sale of securities based on material, nonpublic information.

The Securities and Exchange Commission ("SEC") and the United States Department of Justice vigorously pursue people who violate the insider trading laws and punish offenders severely. While the government typically pursues enforcement against the individuals who make illegal trades, or who tip inside information to others who trade, the Company or other "controlling persons" could be subject to potential liability for failure to take reasonable steps to prevent insider trading by employees.

This Policy also prohibits even the appearance of improper conduct by employees, employees of foreign subsidiaries or anyone associated with the Company (not just so-called "insiders"). The same restrictions that apply to you, apply to your family members who reside with you, anyone else who lives in your household and family members who do not live in your household but whose transactions in Company securities are directed by you or are subject to your influence or control.

If you are aware of material nonpublic information when your employment or service relationship with Ryder terminates, you still may not trade in Company securities until that information has become public or is no longer material.